# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 14-072V
Filed: May 9, 2017

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| KARA BILODEAU, *and* | * | |
| TODD BILODEAU, *parents of* | * | |
| E.B., *a minor*, | * | |
| | * | Attorneys' Fees and Costs; |
| Petitioners, | * | Reasonable Basis; Expert |
| | * | Qualifications |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

*Ronald C. Homer, Esq., Conway, Homer, P.C., Boston, MA, for petitioners.*
*Ann D. Martin, Esq., U.S. Dept. of Justice, Washington, DC, for respondent.*

## DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

**Roth,** Special Master:

On January 27, 2014, petitioners filed a petition for Vaccine Compensation in the National Vaccine Injury Compensation Program ("the Program"),[2] alleging that their child, E.B., suffered pneumonia following the administration of pneumococcal, measles-mumps-rubella ("MMR"), and influenza ("flu") vaccines. Petition ("Pet.") at 1, ECF No. 1. On July 25, 2016, petitioners filed an

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I intend to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)).  In accordance with Vaccine Rule 18(b), petitioner have 14 days to identify and move to delete medical or other information, that satisfies the criteria in § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision.  If, upon review, I agree that the identified material fits within the requirements of that provision, I will delete such material from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 *et seq.* (hereinafter "Vaccine Act" or "the Act").  Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Unopposed Motion for a Decision Dismissing the Petition. ECF No. 64. A decision dismissing the petition was issued that same day. Decision, ECF No. 65.

On February 8, 2017, petitioners filed a Motion for Attorneys' Fees and Costs ("Fee App.") requesting $43,341.79 in attorneys' fees and $6,019.92 in costs. Petitioners' out of pocket costs were $400. The total request for attorneys' fees and costs were $49,761.61. Fee App. at 1, ECF No. 69.

On February 27, 2017, respondent filed a response ("Resp. Opp."), stating that "[t]he case lacked a reasonable basis at the time the petition was filed, and petitioners failed to obtain evidence to satisfy the reasonable basis requirement during the pendency of the case", arguing that all attorneys' fees and costs should be denied. In the alternative, respondent argued that after the Special Master's Order of November 2, 2015, reasonable basis ended when petitioners' counsel learned that they could not obtain the opinion of a qualified medical expert and turned back to a naturopathic doctor to provide an expert report. Resp. Opp. at 7, ECF No. 71.

On March 9, 2017, petitioners filed a reply ("Pet. Fee Reply") incorrectly titled "Petitioners' Reply to Respondent's Opposition to Petitioner's Application for Interim Attorneys' Fees and Costs." Pet. Fee Reply, ECF No. 72. In their reply, petitioners argued that their petition was filed with and maintained reasonable basis for the entirety of its pendency, and therefore they should be granted attorneys' fees and costs in full. *See* Pet. Fee Reply at 16, ECF No. 72.

For the reasons set forth below, petitioners' motion is **granted** and they are awarded, **$43,341.70** in attorneys' fees and **$6,019.92** in costs.  Petitioners are also awarded **$400** for costs personally incurred, pursuant to General Order No. 9.

## I.      BACKGROUND

### A.  Procedural History

The petition was filed on January 27, 2014 and assigned to Special Master Christian Moran. ECF No. 1; Notice of Assignment, ECF No. 2. On January 30, 2014, an initial order was issued, along with a scheduling order requiring petitioners to file outstanding medical records by March 7, 2014. Initial Order, ECF No. 4; Scheduling Order, ECF No. 5.

Petitioners filed medical records on January 30, 2014 and March 4, 2014. Petitioners' Exhibits ("Pet. Exs.") 1-12, 13. ECF Nos. 6, 7, 9. A Statement of Completion was filed on March 7, 2014. ECF No. 11. Respondent filed a status report ("Res. S.R.") on April 7, 2014, stating that the record appeared complete. Respondent reserved his right to request additional records if the necessity arose and proposed a deadline of June 4, 2014 for his Rule 4(c) Report ("Rule 4"). Res. S.R., ECF No. 12. An order was issued setting the deadline for respondent's Rule 4 for June 4, 2014, and scheduling a status conference for June 11, 2014. Scheduling Order, ECF No. 13.

On June 4, 2014, respondent filed his Rule 4, stating that on the existing record, petitioners had not provided preponderant evidence in support of their petition for compensation, and an expert report would be required. Rule 4, ECF No. 14.

An initial status conference was held on June 11, 2014. Respondent's counsel stated that settlement was not appropriate at that time, but that respondent would be willing to reevaluate the matter upon submission of an expert report from petitioners.  Petitioners advised that they would be filing an expert report. During the conference, the special master raised a question of reasonable basis, stating that he was unfamiliar with vaccines causing pneumonia. In a footnote to his post-conference order, the special master stated that he would evaluate reasonable basis, if needed, when an application for attorneys' fees and costs was submitted. He also stated that, because E.B. had recovered from her pneumonia, the damages in this case were modest. Petitioners were ordered to file a status report by July 28, 2014, advising on their progress in retaining an expert. A status conference was set for August 11, 2014. Scheduling Order, ECF No. 15.

Over the next sixteen months, numerous motions, responses, and replies were filed by the parties on the issue of reasonable basis. Petitioners also filed motions for interim costs for expert fees in light of the concerns raised about reasonable basis.

On October 19, 2015, Chief Special Master Dorsey issued an order of reassignment. ECF No. 54. On October 20, 2015, this matter was reassigned to the undersigned. Notice of Reassignment, ECF No. 55.

On October 30, 2015, an in depth status conference was held. We discussed the issue of reasonable basis, the medical records that were filed in support of the petition, and the statements filed by petitioners from Dr. Ackerly, one of E.B.'s treating physicians. Pet. Ex. 18-19. I noted that Dr. Ackerly's statements explicitly linked E.B.'s pneumonia to her vaccinations, constituting evidence relevant to the inquiry into reasonable basis. I also noted that I was not bound by the decisions or impressions of the previous special master assigned to this matter. It was my impression that Dr. Ackerly's statements met the minimal standard for establishing reasonable basis. While I noted that Dr. Ackerly's statements by themselves were likely not sufficient to establish petitioners' entitlement to compensation, I believed there was reasonable basis for the filing of the claim and for the claim to proceed. I advised petitioners that an expert report would be necessary that complied with the three prongs of *Althen v. Sec'y, of Health and Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005). Petitioners were ordered to file their expert report by January 4, 2016.   Scheduling Order, ECF No. 56.

Thereafter, petitioners filed unopposed Motions for Extensions of Time within which to file their expert report, which were granted. ECF No. 57; Non-PDF Order issued January 5, 2016; ECF No. 58; Non-PDF Order, issued March 7, 2016; ECF No. 59; Non-PDF Order, issued April 18, 2016.

On April 25, 2016, petitioners filed an expert report from Susan Ackerly, N.D. Pet. Ex. 22, ECF No. 60. Medical literature was filed on May 3, 2016. Pet. Exs. 23-39, ECF No. 61.

A status conference was held on May 26, 2016. During the conference, respondent's counsel stated that there were some problems with petitioners' recently-filed expert report authored by Dr. Ackerly, who is a naturopath as well as a treating physician. In respondent's opinion, Dr. Ackerly lacked the credentials to opine on the epidemiology in this matter. Respondent's counsel also stated that her client was not interested in settling this case based on the materials filed to date. I told petitioners' counsel to speak with her clients about respondent's position and file a status report by July 11, 2016 as to how they would like to proceed. Having filed the expert report of Dr. Ackerly on April 25, 2016, I cautioned petitioners' counsel against expending funds for an additional expert report at this juncture. Scheduling Order, ECF No. 62.

Petitioners filed a Motion for Extension of Time within which to file their status report, which was granted. Non-PDF Order, issued July 12, 2016.

On July 25, 2016, petitioners filed an unopposed Motion for a Decision Dismissing the Petition. Motion to Dismiss, ECF No. 64. That day, the undersigned issued a decision dismissing the petition. Decision, ECF No. 65. Judgment entered on September 7, 2016. Petitioners' Election to File a Civil Action ("Election") was filed on September 9, 2016. Election, ECF No. 67.

On February 8, 2017, petitioners filed a Motion for Attorneys' Fees and Costs. Fee App., ECF No. 69. In accordance with General Order No. 9, petitioners filed a "Notice" stating they incurred $400.00 in out of pocket expenses. ECF No. 70.

On February 27, 2017, respondent filed a response ("Resp. Opp."). Respondent stated that petitioners' Motion for Fees should be denied, as there was no reasonable basis for filing the petition. Alternatively, respondent argued that reasonable basis ended after the Court's order of November 2, 2015, when counsel learned that they could not obtain the opinion of a qualified medical expert and turned to Dr. Ackley, a naturopathic doctor. Respondent also submitted that petitioners should not be paid for the time it took in generating an unsolicited settlement demand. Resp. Opp., ECF No. 71.

Petitioners filed a reply ("Pet. Fee Reply") on March 9, 2017, maintaining that they had a reasonable basis upon which to file their claim and maintained reasonable basis during the entirety of the case. Petitioners requested that they be granted their attorneys' fees and costs in full. Pet. Fee Reply, ECF No. 72.

## II.    APPLICABLE LAW

In general, the Vaccine Act permits an award of reasonable attorneys' fees and costs. §15(e). Determining whether an application for fees is reasonable is a matter within the discretion of the presiding special master. *See Carrington v. Sec'y of HHS,* 85 Fed. Cl. 319, 322-23 (Dec. 10, 2008). Special masters are afforded considerable discretion when considering motions for attorney fees. For instance, it is within a special master's discretion to reduce fees *sua sponte,* without warning to petitioners. *Sabella v. Sec'y of HHS,* 86 Fed. Cl. 201, 208-09 (Mar. 2, 2009).

When considering motions for attorney fees and costs, the Court employs the lodestar method to determine the amount an attorney should be compensated for. *Schueman v. Sec'y of HHS,* No. 04-693V, 2010 WL 3421956 (Fed. Cl. Spec. Mstr. Aug. 11, 2010); *see also Blanchard v. Bergeron,* 489 U.S. 87, 94 (1989) ("The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.") (internal citations omitted). That said, a special master is not required to conduct a "line-by-line" analysis of a fee request. *Broekelschen v. Sec'y of HHS,* 102 Fed. Cl. 719, 729 (Oct. 31, 2011). Additionally, a special master is "entitled to use…prior experience in reviewing fee applications," including experience with particular attorneys. *Riggins v. Sec'y of HHS,* 406 Fed. Appx. 479, 481 (Fed. Cir. 2011) (citing *Saxton v. Sec'y of HHS,* 3 F.3d 1519, 1521 (Fed. Cir. 1993)).

Specific hourly rates have been set for the attorneys of Conway Homer (formerly Conway, Homer, & Chin-Caplan, or "CHCC"). *McCulloch v. Sec'y of HHS,* 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). Special Master Gowen held that Washington, D.C. forum rates should apply to CHCC fees. He particularly noted that petitioner's counsel's firm, CHCC, is "one of the most active firms in the representation of petitioners in the Vaccine Program;" additionally, "[s]pecial masters have noted in other cases that the firm does high quality work for its petitioners." *Id.* at *3, *19. Furthermore, for the years 2014 and 2015, Special Master Gowen established hourly billing rates for the attorneys representing these petitioners as follows: $415 for Kevin Conway, $400 for Ronald Homer, $400 for Sylvia Chin-Caplan, $300 for Christine Ciampolillo, $290 for Joseph Pepper, $285 for Amy (Fashano) Schwader, $280 for Meredith Daniels, $145 for law clerks, and $135 for paralegals. *Id.* at *21. The rates requested in the instant matter are in keeping with the rates prescribed by *McCulloch*.

Applying these standards, the undersigned finds, for the reasons discussed below, that an award of attorneys' fees and costs is reasonable and appropriate in this case.

## III.    ANALYSIS

Petitioner's counsel requested $49,761.62 in attorneys' fees and costs and $400.00 in petitioner's costs. Fee App. at 1.

Respondent maintains his prior position as set forth in detail to all of the motions filed in this matter on reasonable basis and objects to an award of attorneys' fees and costs on the grounds that the claim for which the petition was brought lacks a reasonable basis.  Respondent further stated: "[N]evertheless, recognizing that on November 2, 2015, the Special Master issued an Order finding that there was a reasonable basis to proceed with the case, respondent refrains from re-arguing this position here.  Rather, on the issue of whether a reasonable basis existed through November 2, 2015, respondent respectfully takes this opportunity to preserve for any potential appeal the objections and arguments advanced in the three filings cited above." Resp. Opp. at 4.  Respondent states that even assuming for purposes of argument that petitioners had a reasonable basis to file this case, it ended long before they requested dismissal. Resp. Opp. at 5.

### a. Reasonable basis

The Vaccine Act permits an award of reasonable attorneys' fees and costs, if the petition was "brought in good faith and there was a reasonable basis." §15(e)(1). "Neither the Federal Circuit nor [the United States] Court [of Federal Claims] has had occasion to define the meaning of 'reasonable basis' for purposes of fee awards under the Vaccine Act," but it has been interpreted in several cases. *See, e.g., Woods v. Sec'y of HHS,* 105 Fed. Cl. 148, 153 (June 4, 2012).

Reasonable basis is typically viewed as "an objective standard determined by the 'totality of the circumstances.'" *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (May 30, 2014) (citations omitted). This somewhat amorphous standard has often been defined not by what it includes, but rather by what is lacking in cases in which a reasonable basis has been found not to exist. Typically, reasonable basis is not found when "fundamental inquires [sic] are not made." *Di Roma v. Sec'y of HHS,* No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Additionally, a case may have a reasonable basis when filed, but may lose reasonable basis during the pendency of the case. *Perreira v. Sec'y of HHS,* 33 F.3d 1375, 1376-77 (Fed. Cir. Aug. 31, 1994); *McNett v. Sec'y of HHS,* No. 99-684V, 2011 WL 760314, at *6 (Fed. Cl. Spec. Mstr. Feb. 4, 2011). Furthermore, the burden lies with petitioner to "affirmatively demonstrate a reasonable basis." *McKellar v. Sec'y of HHS,* 101 Fed. Cl. 297, 305 (Nov. 4, 2011). Some of the factors considered when assessing reasonable basis include: "'the factual basis, the medical support, jurisdiction issues', and the circumstances under which a petition is filed." *Chuisano,* 116 Fed. Cl. at 288 (citing *Di Roma,* 1993 WL 496981, at *1). Neither the fact that no medical records or supportive expert opinion was filed nor the fact that the claim was filed beyond the statute of limitations automatically negates a finding of reasonable basis. *Chuisano,* 116 Fed. Cl. at 288 (citations omitted). Furthermore, "[a] looming statute of limitations does not forever absolve a petitioner from his or her obligation to proceed with a reasonable basis to support his claim, at least not if the petitioner hopes to recover any fees and costs." *Id.* at 287 (citations omitted).

If a petitioner succeeds on the merits of his or her claim, the Vaccine Act requires the special master to award reasonable fees and costs. §300aa-15(e)(1). However, the special master also enjoys discretion to award fees and costs to unsuccessful petitioners, provided the unsuccessful petition was filed in good faith and there was a reasonable basis to support the claim. *Id*. The statute grants to the special master maximum discretion in applying the standard. *See Silva v. Sec'y of HHS,* 108 Fed. Cl. 401 (2012).

### 1. Challenges to reasonable basis in this matter.

A vaccine related injury is not always clear. The Federal Circuit has noted, "[t]he first time an injury is causally linked with a vaccine often occurs as a result of a successful non-Table petition." *Cloer v. Sec'y of HHS* ("*Cloer I*"), 654 F.3d 1322, 1332 n.4 (Fed. Cir. 2011). Congress would not have "intended to discourage counsel from representing petitioners who, because of the difficulty in distinguishing between the initial symptoms of a vaccine-related injury and unrelated malady…may [nevertheless] have good-faith claims with a reasonable basis…" *Sebelius v. Cloer ("Cloer III")*, 133 S.Ct. 1886, 1895 (2013). "A stated purpose of the Act's fees scheme was to avoid 'limit[ing] petitioners' ability to obtain qualified assistance' by making fees

6

awards available for 'non-prevailing, good-faith claims.'" *Chuisano* 116 Fed. Cl. at 285; *Cloer III*, at 1895 (quoting H.R. Rep. No. 99-908 at 22); *see also Cloer v. Sec'y of HHS ("Cloer II")*, 675 F.3d 1358, 1362 (Fed. Cir. 2012) ("Congress recognized that having to shoulder attorneys' fees could deter victims of vaccine-related injuries from seeking redress.").

Though the interpretation of what constitutes "reasonable basis" varies, the common thread is an objective standard determined by the "totality of the circumstances." *Chuisano*, 116 Fed. Cl. at 286; *McKellar v. Sec'y of HHS*, 101 Fed. Cl. 297, 303 (Fed. Cl. 2011)(citing *Hamrick v. Sec'y of HHS*, No. 99-683V, 2007 WL 4793154 at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007)). The reasonable basis inquiry is broad enough to encompass any material submitted in support of the claim at any time in the proceeding, whether with the petition or later. *Chuisano*, 116 Fed. Cl. at 287. The reasonable basis standard does not look to the "likeliness of success but more to the feasibility of the claims." *Id.* at 285. It "is something less than preponderant evidence ultimately required to prevail on one's vaccine injury claim." *Id.* at 287.

### 2. Reasonable basis existed in this matter.

On October 30, 2015, following a thorough review of the materials filed in this matter, I determined that petitioners had a reasonable basis to file the petition and to proceed with the claim. In his Rule 4 report, respondent did not question reasonable basis but simply stated that, on the existing record, petitioners had not provided preponderant evidence in support of their petition for compensation, and an expert report would be required. Furthermore, on June 11, 2014, at the initial status conference, respondent's counsel stated that, while settlement was not appropriate at that time, the matter might be reevaluated upon submission of an expert report from petitioner. Petitioners advised that they were prepared to file an expert report.

On September 25, 2014, Dr. Ackerly issued a letter documenting E.B's history of pneumonia, respiratory failure, bronchiolitis and hospitalization on February 21, 2011 following receipt of Prevnar 13, Fluzone and MMR II on February 18, 2011. According to Dr. Ackerly, E.B. was a healthy infant with no prior issues of asthma, bronchitis or other respiratory issues. Dr. Ackerly opined that the vaccinations that E.B. received were directly involved in her development of pneumonia and bronchiolitis. "Specifically, E.B. suffered from two out of the three most serious side effects of Prevnar 13 (bronchiolitis 0.9% and pneumonia 0.9%), as reported in the research." According to Dr. Ackerly, the timing of E.B.'s response was consistent with an acute vaccine response. Further, bronchiolitis and pneumonia can predispose a person to the development of a pneumothorax and subsequent respiratory failure which E.B. experienced. Pet. Ex. 18 at 1; Pet. Ex 16.

In addition, Dr. Ackerly stated that the MMR vaccine contains glutamate, a known neurotoxin that can initiate bronchial spasms, which may have contributed to the severity of this case. According to Dr. Ackerly, E.B.'s glutamate level was at 126.5 on a reference range of 13.5-36.8, which was extremely high, putting her at risk for seizures. Dr. Ackerly stated that glutamate is an excitatory neurotransmitter that is extremely neurotoxic. The MMR vaccine that E.B received contained monosodium glutamate. Her neurotransmitter testing showed significant up regulation of her excitatory nervous system, consistent with persistent neurotoxicity,

potentially from her body's inability to clear the additives and adjuvants contained in the vaccines she received. Pet. Ex. 18 at 1.

On November 16, 2014, Dr. Ackerly submitted a supplemental letter defending her credentials. Dr. Ackerly stated that she has an undergraduate degree in biology and attended the National College of Natural Medicine, a four year federally accredited medical school program that trains primary care naturopathic physicians. After completion of a doctorate in natural medicine and specialty certification in naturopathic obstetrics, she completed two years in naturopathic family practice and oversaw the clinical training of naturopathic medical students in the Portland Naturopathic Clinic. She was also on the faculty at National College of Natural Medicine where she taught classes and conducted grand rounds on a weekly basis. Dr. Ackerly submitted that her studies included courses in clinical/physical diagnosis, microbiology, immunology, public health/epidemiology, pediatrics, neurology, biochemistry, and anatomy and physiology. Dr. Ackerly stated that her training, like any physician going through medical school, provided the foundation to assess the physiological and immunological reactions related to vaccine administration. She preceptored with pediatricians, family practice physicians and naturopathic family practice physicians during her training, all of whom counseled and provided vaccinations to their patients. Dr. Ackerly added that in her 19 years of private practice specializing in naturopathic family medicine, she has provided a broad range of education on vaccinations and administers vaccinations to her patients. Pet Ex. 19 at 1; Pet. Ex. 20.

In addition, Dr. Ackerly stated that in 2012, she completed a two day training program in vaccinations with Dr. Heathery Zwickey who holds a Ph.D. in Immunology and Microbiology. Dr. Ackerly explained that this was a program for doctors which provided an in depth analysis of each vaccination, its historical use, CDC documents and research on timing, and the risks and benefits of the vaccination. An in depth analysis of each vaccine and potential adverse reactions and immunological responses were reviewed. Pet. Ex. 20 at 1. Dr. Ackerly also stated that she has been a provider of vaccinations supplied by the Maine Immunization Program in the State of Maine to aid in greater access to vaccinations and has attended training sessions offered by the State CDC and Maine Immunization Program for a number of years. Pet. Ex. 19 at 1; Pet. Ex. 20.

Dr. Ackerly then highlighted the adverse reactions listed in the package insert for the Prevnar 13 vaccination received by E.B., noting that, unlike the reports contained in the Prevnar 13 insert, E.B. did not have a previous history of any risk factors. Pet. Ex. 19 at 2; Ex. 38.

Dr. Ackerly then submitted an expert report dated April 25, 2016, in which she stated that it was her opinion, to a reasonable degree of medical certainty, that E.B. developed respiratory distress and pneumonia with subsequent pneumothorax and respiratory failure as a direct consequence of having received the MMR, Prevnar 13 and Fluzone vaccines. Dr. Ackerly opined that the events were consistent with an immune mediated inflammatory response. Dr. Ackerly stated that her opinion was based on an extensive review of the medical and scientific literature on the subject. Pet. Ex. 22 at 1.

Dr. Ackerly further explained that reactive airway inflammation can result from environmental stimuli inducing an allergen-antibody interaction that causes a release of inflammatory mediators. According to Dr. Ackerly, airway inflammation is the primary cause of

smooth muscle reactivity, edema, and increased mucus production that affects respiration. "Mast cells, eosinophils and white blood cells release histamine, leukotrienes, cytokines, interleukins, platelet-activating factor and tumor necrosis factor. These inflammatory compounds create significant toxicity in the respiratory epithelial cells from edema, mucus production and bronchospasm." Pet. Ex. 22 at 1. Dr. Ackerly explained that infants have more highly responsive airways due to an increased production of immunoglobulin E (IgE) levels in the first two years of life. A decrease in airway responsiveness may be associated with respiratory diseases, hereditary factors and environmental allergen exposure, none of which applied to E.B. *Id.* at 2. E.B. did not have any anatomical factors which would have contributed to her compromise, nor was she exposed to second hand smoke prenatally or in the first year of life. *Id.*

According to Dr. Ackerly, though vaccines must conform to rigorous standards for safety, quality, and efficacy, there remains the risk for adverse events. Adverse events can involve immune mediated phenomena triggered by exposure to microbial or other components of a vaccine. There are various hypersensitivity reactions that may be localized or systemic. This can induce cross-linking of IgE bound to mast cells and basophils with degranulation and release of vasoactive mediators that affect smooth muscles of the pulmonary tissue. *Id.* at 2. Dr. Ackerly submitted that this results in the induction of IgE antibody specific for extraneous protein found in vaccines, two main components being gelatin and egg protein. Pet. Ex. 22 at 2.

In support of her report, Dr. Ackerly cited to and provided numerous articles addressing various vaccines and the components of each, including adjuvants, the effect on the body and/or organs, and the body's inability to dispose of these substances, particularly the body of a child under the age of two. Pet. Ex. 22 at 2-4. Dr. Ackerly stated that the Journal of Comparative Pathology notes that there are consequences of vaccine interference and that this phenomenon argues that individual vaccines should not be combined or associated in the absence of specific data sheet recommendations to do so. Pet. Ex. 35.[3] Dr. Ackerly further noted that adjuvants are carefully added to vaccines so as not to trigger too powerful an immune reaction, but that is what happened here when multiple vaccines were administered at one time. Pet. Ex. 37;[4] Pet. Ex. 22 at 5.

Dr. Ackerly stated that all of the tests run on E.B. while she was hospitalized were negative for influenza and respiratory syncytial virus (RSV), confirming that there was no evidence of infection to indicate an origin of E.B.'s pneumonia other than her vaccinations. Pet. Ex. 22 at 6. Dr. Ackerly also pointed out that E.B. developed a macular pruritic rash on her body, face, and extremities, which occurs in 2-5% of individuals who receive the MMR vaccine. *Id.* Furthermore, Dr. Ackerly pointed out that the cumulative effects of adjuvants, particularly

---

[3] E. Vidor, *The Nature and Consequences of Intra- and Inter-Vaccine Interference*, J. COMP. PATHOL., 137 (1): S62-66 (2007), filed as Pet. Ex. 35.

[4] GS Goldman and NZ Milles, *Relative trends in hospitalizations and mortality among infants by the number of vaccine doses and age, based on the Vaccine Adverse Event Reporting System (VAERS) 1990-2010*, HUM. EXP. TOXICOL., 31(10): 1012-21, filed as Pet. Ex. 37.

aluminum, has a toxic effect on the immune system. Pet. Ex. 14;[5] Pet. Ex. 22 at 6. Finally, Dr. Ackerly submitted that the timing of E.B.'s response was consistent with acute vaccine response and E.B.'s pneumonia was solidly within the time period expected, citing the Prevnar package insert (Pet. Ex. 38[6]) and the Cochrane database for MMR. Pet. Ex. 39;[7] Pet. Ex. 22 at 7. *See also* references 1-17.

When I was assigned this matter in October of 2015, I was not bound by the decisions or impressions of the previous special master assigned to this case. *See McGowan v. Sec'y of HHS,* 31 Fed. Cl. 734, 737-38 (1994) Decsions issued by special masters and judges of the U.S. Court of Federal Claims constitute persuasive, not binding, authority. *Hanlon v. Secretary of Health and Human Services,* 40 Fed. Cl. 625, 630 (1998).  This provided me with the opportunity to review this matter anew. At that time, I found, after a thorough review of the medical records and documentation filed, that petitioners had a reasonable basis to file the claim and to proceed. Scheduling Order, ECF No. 56.

Based on the totality of the circumstances, it continues to be my opinion that the medical records, statements and report of Dr. Ackerly, along with the accompanying literature, provided a reasonable basis for not only the filing of this matter, but also the continuation of this claim through the time in which petitioners dismissed their petition.

### b. Challenges to expert fees

#### 1. Hiring an expert prior to filing a claim.

Over the course of these proceedings and in his responses to petitioners' motions, respondent argued that petitioners should have obtained an expert report prior to filing their claim. This, however, is not a requirement. To do so would effectively raise the bar for filing from "reasonable basis" to "likelihood of success." A heightened filing standard would likely deter future individuals who have sustained vaccine injuries from filing. The ultimate purpose of the Vaccine Program is to provide relief for those who have sustained vaccine injuries, and the program has been structured with minimal barriers to relief in order to best effectuate that purpose. Denying that a petitioner had a reasonable basis for filing his claim based on his failure to ensure before filing his claim that it would be supported by an expert would be in contravention of the program's intentions. To expect petitioners to have retained an expert and incurred the costs of same prior to the respondent giving his assessment of the case would likely have been seen as an unnecessary and premature expense. *See Guerrero v. Sec'y of HHS*, No. 12-689V, 2015 WL 3745354 n.3 (Fed. Cl. Spec. Mstr. May 22, 2015), *rev'd in part on other*

---

[5] CA Shaw, et al., *Aluminum-Induced Entropy in Biological Systems: Implications for Neurologica Disease*, J. TOXICOL., 2014: 491316 (2014), filed as Pet. Ex. 36.

[6] Prescribing Information Prevnar 13 – Package Insert, filed as Pet. Ex. 38.

[7] V. Demicheli, et al., *Vaccines for measles, mumps and rubella in children*, COCHRANE DATABASE SYST. REV. 2: CD004407 (2012), filed as Pet. Ex. 39.

*grounds,* 124 Fed. Cl. 153 (2015) (opining that petitioners are strongly discouraged from preemptively providing expert reports, as it results in unnecessary costs to the program).

Respondent has previously cautioned petitioners against filing expert reports before receiving an order to consult with an expert. Therefore, I will not indulge respondent's argument to the contrary in this case in an effort to avoid paying attorneys' fees and costs.

## 2. Qualifications of petitioner's expert, Dr. Ackerly, a naturopathic physician.

Vaccine Rule 8(b)(1) provides, in part, that a special master "must consider all relevant and reliable evidence governed by principles of fundamental fairness to both parties." The seminal case on what constitutes reliable evidence in the scientific context is *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993). The court in *Daubert* held that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Id*. at 590. Special Masters may look to *Daubert* in evaluating expert testimony. *See Cedillo v. Sec'y of HHS*, 617 F. 3d 1328, 1338-39 (Fed. Cir. 2010); *Terran v. Sec'y of HHS*, 195 F. 3d 1302, 1316 (Fed. Cir. 1999). *See also Broekelschen v. Sec'y of HHS*, 618 F.3d 1339, 1347 (Fed. Cir. 2010).

In addition, the Federal Circuit has recognized that medical records of treating physicians may be particularly probative in vaccine cases because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Capizzano v. Sec'y of HHS*, 440 F.3d 1317, 1326 (Fed. Cir. 2006) (quoting *Althen v. Sec'y of HHS*, 418 F. 3d 1274, 1280 (Fed. Cir. 2005)). Consequently, treating physicians' opinions are often regarded as "quite probative" with respect to the causation prong under *Althen*. *Andreu v. Sec'y of HHS*, 569 F.3d 1367, 1375 (Fed. Cir. 2009); *Moberly v. Sec'y of HHS*, 592 F.3d 1323.

According to the American Association of Naturopathic Physicians, naturopathic medicine is a distinct primary health care profession which emphasizes prevention, treatment, and optimal health through the use of therapeutic methods and substances that encourage individuals' inherent self-healing processes.[8] The practice of naturopathic medicine includes both modern and traditional scientific and empirical methods. A licensed naturopathic physician attends a four year, graduate level naturopathic medical school and is educated in all of the same basic sciences as a medical doctor, but also studies holistic and nontoxic approaches with strong emphasis on disease prevention and optimizing wellness. Nineteen states, including D.C., have licensing or registration for naturopathic physicians. Pet. Exs. 19-20.

---

[8] "Definition of Naturopathic Medicine," American Association of Naturopathic Medicine. www.naturopathic.org. *See also* Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (cont.) at 1252 (defining "naturopathy" as a "…system of health care, making use of a wide variety of therapies…whose purpose is to treat the whole person to stimulate and support the person's own innate healing capacity.")

Early on in this matter, E.B.'s treating physician, Dr. Ackerly, provided a statement regarding her opinions of the relationship between the Prevnar, MMR, and influenza vaccines E.B. received on February 18, 2011, and her subsequent development of pneumonia and sequelae requiring hospitalization on February 21, 2011. Pet. Ex. 18. It was therefore reasonable for petitioners to file an expert report from Dr. Ackerly expanding on that statement and providing the literature referenced by her in support of her opinions. Pet. Exs. 16; 22-39.

Dr. Ackerly spent 18 hours reviewing E.B.'s medical history, researching and reviewing literature, and drafting her expert report at a rate of $300/hour for a total bill of $5,400.00. It does not appear from the billing records submitted that Dr. Ackerly charged for the September 25, 2014 or November 16, 2014 statements that were filed in this matter. Pet. Exs. 18-19.

I find the costs associated with Dr. Ackerly's expert report to be reasonable and competitive in the program and award the full amount of $5,400.00.

**c. Challenges to fees for preparation of a settlement demand.**

Respondent argues that petitioner should not be paid for the preparation of an "unsolicited settlement demand." Resp. Opp. at 6-7. In response thereto, petitioners stated that this was a limited damages case in which they met the statutory requirement of a hospitalization and surgical intervention instead of the six month requirement. In an effort to save program resources, they forwarded a reasonable demand of "past unreimbursed out of pocket expenses and pain and suffering" to respondent after the filing of Dr. Ackerly's expert report. Pet. Fee Reply at 13. Petitioners' counsel billed 0.8 hours of time for the preparation of the settlement demand for a total fee of $222.00. Fee App. at 22.

Petitioners' attempt to resolve this case following their filing of an expert report was not unreasonable. Therefore, I see no reason to reduce their fees.

**d. Reasonable attorneys' fees**

Pursuant to *McCulloch*, the following hourly billing rates have been established for the attorneys and staff of Conway Homer, and are widely accepted: $415 for Kevin Conway, $400 for Ronald Homer, $400 for Sylvia Chin-Caplan, $300 for Christine Ciampolillo, $290 for Joseph Pepper, $285 for Amy (Fashano) Schwader, $280 for Meredith Daniels, $265 for Lauren Fage, $145 for law clerks, and $135 for paralegals.

Respondent submits that "reasonable basis ended when petitioners' counsel…turned back to [Dr. Ackerly] to provide an expert report" and therefore "[c]ompensation for any attorneys' fees and costs from that point forward must be denied." From the time that petitioners' counsel requested an expert report from Dr. Ackerly until the time that the Motion to Dismiss was filed, petitioners' counsel billed 9.7 hours of work for a total of $2,421. This includes 2.3 hours spent preparing Dr. Ackerly's report for filing and 3.4 hours communicating with petitioners.

Having determined that it was reasonable for petitioners to rely on Dr. Ackerly, E.B.'s treating physician, for an expert report in this matter, I disagree with respondent's assertion that

reasonable basis ended upon the decision by petitioners to have Dr. Ackerly render an expert report.  Therefore, I find that it is appropriate to award petitioners' counsel attorneys' fees and costs throughout the pendency of this matter. Furthermore, applying the hourly rates prescribed by *McCulloch*, and having reviewed the billing records for any unreasonable or duplicative billing, for the reasons discussed above, I find that an award of attorneys' fees in the amount of $43,341.79 is reasonable and appropriate in this case.

### e. Reasonable costs

Under the Vaccine Act, Special Masters shall award "reasonable attorneys' fees" and "other costs, incurred in any proceeding on such petition." Section 300aa–15(e)(1). Petitioners have requested $6,019.92 in costs, including $5,400 in expert fees and $445.45 in costs associated with obtaining medical records. Additionally, petitioners incurred $400 in out-of-pocket expenses. These costs appear to be reasonable and appropriate in light of the facts of this case; therefore, I see no need to reduce them.

## IV. CONCLUSION

For the reasons set forth above, petitioners had a reasonable basis upon which to file and pursue this claim. The undersigned has reviewed the billing records and costs submitted with petitioner's request. In the undersigned's experience, the request is reasonable in light of the tortured procedural history in this matter, and the undersigned finds no cause to reduce the requested attorneys' fees and costs.

## V. TOTAL AWARD SUMMARY

The Vaccine Act permits an award of reasonable attorneys' fees and costs. § 15(e). Based on the reasonableness of petitioner's request, the undersigned **GRANTS** petitioner's motion for attorneys' fees and costs.

**Accordingly, the undersigned awards the total of $49,761.62[9] as follows:**

- **A lump sum of $49,361.62, representing reimbursement for attorneys' fees and costs, in the form of a check payable jointly to petitioners and petitioners' counsel, Ronald Homer, of Conway, Homer, P.C.; and**

- **A lump sum of $400.00, representing reimbursement for petitioners' costs, in the form of a check payable to petitioners, Kara Bilodeau and Todd Bilodeau.**

---

[9] This amount is intended to cover all legal expenses incurred in this matter. This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered. Furthermore, § 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein. *See generally Beck v. Sec'y of HHS,* 924 F.2d 1029 (Fed. Cir. 1991).

The clerk of the court shall enter judgment in accordance herewith.[10]

**IT IS SO ORDERED.**

<u>**s/Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.